**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

SUSAN M. ROGERS, Administratrix of the
Estate of WILLIAM R. ROGERS III,
deceased, and in her own right

        Plaintiff,

    v.


A.O. SMITH CORPORATION, et al.,

        Defendants.

CIVIL ACTION
NO. 19-573

## <u>MEMORANDUM</u>

SCHMEHL, J. /s/ JLS                     MAY 10, 2022

      This asbestos injury case was originally brought by Plaintiffs William R.

Rogers, III ("Rogers") and Susan M. Rogers in the Court of Common Pleas of

Philadelphia County, then removed by Defendant Huntington Ingalls Industries to

this Court on the basis of federal officer removal jurisdiction. See 28 U.S.C. §

1442(a)(1). The case was added to the consolidated asbestos products liability

multidistrict litigation (MDL-875) where it was made part of that Court's maritime

docket ("MARDOC") for pretrial management. The Plaintiffs subsequently filed an

amended complaint naming 65 product manufacturers as Defendants. Following

the death of Rogers on August 23, 2019, Susan Rogers, Administratrix of the

Estate of William Rogers, was substituted as Plaintiff.

      Plaintiff alleges that Rogers developed mesothelioma as a result of

exposure to asbestos-containing products during the course of his employment

with the U.S. Navy while serving on the U.S.S. Forrestal (the "Forrestal"), an aircraft carrier commissioned in October,1955.   Plaintiff contends that Rogers was injured due to exposure to asbestos-containing products that the Defendants manufactured, sold, distributed, or installed. Accordingly, Plaintiff asserts claims for negligence, strict liability, punitive damages and loss of consortium.

Following completion of pretrial procedures, Plaintiff filed a Notice of Dismissal as to 46 of the Defendants [ECF 270]. Many of the remaining Defendants filed motions for summary judgment. The MDL Court granted four of these motions as unopposed [ECF 309]. As a result, six summary judgment motions remained pending. These motions were filed by Defendants CBS Corporation/Westinghouse[1], Copes Vulcan, Inc./Electrolux Home Products[2], Aurora Pump Company, General Electric Company, Carrier Corporation and Crane Co. On December 28, 2020, the case was randomly reassigned to the undersigned for "resolution of all remaining dispositive issues." [ECF 311.] The Court will now address the six pending motions for summary judgment.

**STANDARD OF REVIEW**

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is "material" if proof of its existence or non-existence

---

[1] CBS Corporation (a Delaware corporation f/k/a Viacom, Inc.), now known as ViacomCBS Inc., is a successor by merger to CBS Corporation (a Pennsylvania corporation f/k/a Westinghouse Electric Corporation).
[2] Electrolux Home Products is the successor to Copes Vulcan, Inc.

might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 242 (1986); see *Scott v. Harris*, 550 U.S. 372, 380 (2007). The mere existence of some disputed facts will not overcome a motion for summary judgment. *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 581 (3d Cir. 2009) (quoting *Anderson*, 477 U.S. at 247-48). In undertaking this analysis, the Court must view all facts in the light most favorable to the non-moving party. *Scott*, 550 U.S. at 380.

While the moving party bears the initial burden of showing the absence of a genuine dispute of material fact, meeting this obligation shifts the burden to the non-moving party who must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250.

**<u>GENERAL FACTS</u>**

Unfortunately, Rogers passed away before he could be deposed. As a result, Plaintiff relies on the depositions of three of Rogers' former shipmates, Myron Chicota ("Chicota"), James Schwanger ("Schwanger") and Mario Esposito ("Esposito"), to support her claim that Rogers was exposed to the Defendants' asbestos-containing products while aboard the Forrestal.

Rogers served on board the Forrestal from May 9, 1967 through April 16, 1970 as a B Division Boilerman/Boiler Technician. ECF 293-19 at 17, 23. Chicota, testified that he was a B Division yeoman on the Forrestal from 1966-1968. Chicota Dep., ECF 293-1 at 19. As a yeoman, Chicota's main job was to enter the four main engine rooms and two auxiliary rooms on a daily basis to

make sure that preventive maintenance was being performed on the all the machinery in those rooms. *Id*. at 22-24. Chicota also testified that he was responsible for ordering parts for the machinery in the engine rooms, including gaskets, pumps, steam traps, circulating pumps and valves. *Id*. at 25.

Chicota testified that approximately "once a day" he observed Rogers working in Engine Room 1. *Id*. at 42. According to Chicota, Rogers' main job was to "maintain, clean and keep operational all of the equipment based on whether they broke down or if it was preventive maintenance." *Id*. at 51. Chicota testified that Rogers removed and replaced the packing and gaskets on valves. *Id*. at 53-56. According to Chicota, the process of removing and replacing the packing and gaskets gave off dust. *Id*. at 56.

Following a fire on the Forrestal on July 29, 1967, the ship was sent to drydock in Norfolk, Virginia for approximately six months. *Id*. at 92. While in drydock, the Forrestal underwent major repairs, including the reconditioning of the four engine rooms and the two auxiliary rooms. *Id.* at 92. Chicota testified that while the ship was in drydock, Rogers "work[ed] on the valves, the steam traps, flow regulators…pumps, compressors…" *Id.* at 93. This work included taking apart valves and removing the packing and gaskets and then repacking the valves and assisting in reinstalling them. *Id.* Chicota testified that he was directed by the senior master chief to order asbestos packing or asbestos gaskets "almost like every other day." *Id.* at 64-65.

**DISCUSSION**

As the MDL Court has previously held, and as recently recognized by the Supreme Court in *Air & Liquid Sys. Corp. v. DeVries*, 139 S. Ct. 986, 993 (2019), maritime law applies to this action because both the locality and connection tests are met given that Rogers' alleged exposure occurred during his service aboard a Navy vessel. *See Conner v. Alfa Laval, Inc.*, 799 F. Supp. 2d 455, 463-469 (E.D. Pa. 2011).

To prevail on her negligence and strict liability claims under maritime law, Plaintiff must demonstrate that Rogers' injuries were caused by exposure to asbestos that was attributable to each defendant's conduct. *Lindstrom v. A-C Prod. Liab. Tr.*, 424 F.3d 488, 492 (6th Cir. 2005), *abrogated on other grounds by DeVries*, 139 S.Ct. 986.

In order to establish causation for an asbestos claim under maritime law, a plaintiff must show, for each defendant, that "(1) he was exposed to the defendant's product, and (2) the product was a substantial factor in causing the injury he suffered." *Lindstrom*, 424 F.3d at 492 citing *Stark v. Armstrong World Indus., Inc.,* 21 F. App'x 371, 375 (6th Cir. 2001). The MDL Court has also noted that, in light of its holding in *Conner,* there is also a requirement (implicit in the test set forth in *Lindstrom* and *Stark* ) that a plaintiff show that (3) the defendant manufactured or distributed the asbestos-containing product to which exposure is alleged. *Abbay v. Armstrong Int'l., Inc.,* No. 10–83248, 2012 WL 975837, at *1 n.1 (E.D.Pa. Feb. 29, 2012)(Robreno, J.).

Substantial factor causation is determined with respect to each defendant separately. *Stark,* 21 F. App'x. at 375. In establishing causation, a plaintiff may rely upon direct evidence (such as testimony of the plaintiff or decedent who experienced the exposure, co-worker testimony, or eye-witness testimony) or circumstantial evidence that will support an inference that there was exposure to the defendant's product for some length of time. *Id.* at 376 (quoting *Harbour v. Armstrong World Indus., Inc.,* No. 90–1414, 1991 WL 65201, at 4 (6th Cir. April 25, 1991)).

A mere "minimal exposure" to a defendant's product is insufficient to establish causation. *Lindstrom,* 424 F.3d at 492. "Likewise, a mere showing that defendant's product was present somewhere at plaintiff's place of work is insufficient." *Id.* Rather, the plaintiff must show "'a high enough level of exposure that an inference that the asbestos was a substantial factor in the injury is more than conjectural.'" *Id.* (quoting *Harbour,* 1991 WL 65201, at *4). The exposure must have been "actual" or "real", but the question of "substantiality" is one of degree normally best left to the fact-finder. *Redland Soccer Club, Inc. v. Dep't of Army of U.S.,* 55 F.3d 827, 851 (3d Cir.1995). "Total failure to show that the defect caused or contributed to the accident will foreclose as a matter of law a finding of strict products liability." *Stark,* 21 F. App'x at 376 (citing *Matthews v. Hyster Co., Inc.,* 854 F.2d 1166, 1168 (9th Cir.1988)(citing Restatement (Second) of Torts, § 402A (1965))).

Each of the moving Defendants argue that Plaintiff has failed to produce enough admissible evidence from which a jury could reasonably conclude that

6

Rogers was exposed to asbestos from their products and, even if Plaintiff was able to prove that Rogers was so exposed, she cannot prove that such exposure was a substantial contributing factor in Rogers' illness and death  In addition, should the court decide that causation has been established, some of the Defendants rely upon the "bare metal" defense to avoid liability on the basis that they have no duty to Plaintiff relating to asbestos-containing replacement parts they did not manufacture or distribute.

**Carrier, Inc.**

Carrier, Inc. disputes that it manufactured any asbestos-containing products for the Forrestal.

None of the three product identification witnesses Plaintiff produced testified that Rogers worked with Carrier equipment on the Forrestal. Although Chicota testified that there were Carrier air conditioning units present in Engine Room 1, as well as in the auxiliary rooms where Rogers sometimes worked, see Chicota Dep. at 207, 212, 216, he did not testify that he observed Rogers actually work on these air conditioning units or on any of their internal components. Rather, Chicota testified that Rogers worked on the external pumps, pipe laggings, gaskets and valves with packing that were attached to or near the Carrier air conditioning units in Engine Room 1. *Id.* at 198, 200, 201, 214. Chicota also could not recall any manufacturer names on the specific pumps on which Rogers worked in Engine Room 1. *Id.* at 213. Chicota also could not recall how many times he saw Rogers working on pumps associated with air conditioning units in the engine room. *Id.* at 214, 217. Although Chicota testified

that there were Carrier pumps on the Forrestal, he testified that they were primarily in the auxiliary rooms where, according to Chicota, Rogers only occasionally worked. *Id*. at 20.

Even assuming that there were Carrier air conditioning units in Engine Room 1, Plaintiff has not produced any evidence that any of these units contained asbestos parts. Although Chicota testified that he ordered gaskets or packing for the pumps associated with the Carrier air conditioning units, he also testified that he did not order any asbestos-containing gaskets for the Carrier units. *Id.* at 213-214.

While Plaintiff refers to answers to interrogatories by Carrier (ECF 297-3) and deposition testimony from a corporate representative of Carrier (ECF 297-4) in other cases which show that some compressors made by Carrier contained asbestos-containing gaskets, a jury would be left to speculate whether any Carrier compressors on the Forrestal were fitted with asbestos-containing gaskets.

Finally, Plaintiff's own naval expert, Arthur W. Faherty ("Faherty"), testified that his expert report did not contain any reference to any Carrier equipment on the Forrestal and that he did not have any opinions specific to Carrier that would relate to Rogers. [ECF 288-2 at 139-141.]

Therefore, there is no evidence in the record from which a reasonable jury could conclude that Rogers worked on Carrier compressors or any of their internal parts or that any of the external, pumps, gaskets or valves attached to

the Carrier units that Chicota testified Rogers worked on in Engine Room 1 were actually manufactured by Carrier or contained asbestos.

Plaintiff's reliance on *Brown v. Kaiser Gypsum Co., Inc.*, 2011 WL 6445091 (E.D. Pa. December 12, 2011) is misplaced. In that case, the Plaintiff himself testified that he had to personally remove and replace gaskets that were part of the Carrier air conditioning unit "20 [to] 30 times" and that the replacement gaskets he used on Carrier compressors themselves were Carrier brand. It was this testimony in combination with other evidence that Carrier products contained asbestos, that lead Judge Robreno to deny Carrier's motion for summary judgment.

Here, by contrast, there is no testimony from a single witness that Rogers worked with any Carrier product that contained asbestos. Accordingly, Defendant Carrier is entitled to summary judgment.

## Copes Vulcan, Inc.

A former corporate representative for Copes Vulcan, Royce Billings ("Billings"), averred in an unrefuted affidavit that "Copes Vulcan never marketed, manufactured, distributed, supplied or sold any type of steam trap." [ECF 292 at 5.]

On the other hand**,** Chicota testified that he believed there were over 1000 Copes Vulcan steam traps in Engine Room 1 on the Forrestal. Chicota Dep. at 61. He testified that he recalled these steam traps were a light color blue and had the name "Copes Vulcan" written on them. *Id* at 350. Although Chicota testified that he had a recollection of Rogers performing "normal maintenance" on a

Copes Vulcan steam trap, he could not recall on how many occasions. *Id*. at 351. He recalled that boiler tenders in general would work on steam traps on a daily basis. *Id.* at 351-352. He testified that steam traps generally contained gaskets and packing and that he witnessed Rogers repairing gaskets on steam traps. *Id.* at 61. However, Chicota also named four other manufacturers of steam traps that were used in Engine Room 1 on the Forrestal, *id.* at 61-62 and testified that he did not know how many of each manufacturer's steam traps were in Engine Room 1 because he "couldn't distinguish them." *Id*. at 62. He also testified that Rogers worked on steam traps involved in operating turbines but did not specify the maker of those steam traps. *Id*. at 79.

Although Chicota identified Copes Vulcan steam traps as being present in Engine Room 1 and testified that Rogers performed normal maintenance on Gopes Vulcan steam traps, Plaintiff has failed to establish that any steam traps manufactured by Copes Vulcan contained asbestos. Without evidence that there were **asbestos-containing** steam traps manufactured by Copes Vulcan in Engine Room 1, there is no triable issue of fact with respect to Copes Vulcan steam traps.[3]

Chicota also testified that he had a recollection of Rogers performing general maintenance on Copes Vulcan gate valves. *Id*. at 352-53. He testified that these gate valves were also light blue and had the name "Copes Vulcan" written on them. *Id*. Chicota was unable to recall the number of occasions Rogers

---

[3] The Court also notes that Plaintiff's naval expert, Faherty, admitted that his expert report contained no specific opinions as to Copes Vulcan equipment. ECF. 281, Ex. D, p.144.

performed maintenance work on the Copes Vulcan valves. *Id*. at 352. He also could not recall which systems the Copes Vulcan were used on. *Id*. at 352-353. Chicota also testified that the packing and gaskets on valves needed to be replaced on a regular basis, *id* at 52, and that he observed Rogers "remove the bonnet on valves, remove the securing bolt, remove the packing and install new packing and reassemble the valve." *Id.* at 52-53. Chicota testified that removing the packing gave off dust. *Id*. at 56. Chicota also identified Exhibit p-31 as a Copes Vulcan pneumatically controlled automatic valve and as one of the valves Rogers worked on. *Id*. at 103-104.

Although Chicota testified that he ordered replacement parts from Copes Vulcan, including thousands of gaskets as well as valves and packing, *id*. at 25 26, 37, he could not recall the number of occasions Rogers used the gaskets and packing. *Id*. at 358-59*.* Chicota testified that he assumed that the gaskets and packing that were removed from a Copes Vulcan steam trap or valve were "made by Copes or a direct Copes supplier for that particular piece. As required by the Navy, the parts, the packing and the gaskets, had to be supplied by the manufacturer." *Id*. at 358. Chicota testified that any Copes Vulcan steam valves were covered with asbestos covering and insulation. *Id*. at 366. He further admitted that as part of the repair of the Copes Vulcan valves it was "necessary to remove the asbestos, fix the valve, and then put the asbestos back." *Id*.

In its answers to interrogatories in another case, Copes Vulcan stated that it incorporated asbestos-containing gaskets and packing in certain of its products until 1986. ECF 293, Ex. I. In a separate action, corporate representative Billings

testified that all valves that Copes Vulcan manufactured from 1974 to 1981 contained an asbestos component part, asbestos packing or gaskets. ECF 293, Ex. K at 37.

Viewing the evidence in the light most favorable to Plaintiff, the Court finds that Plaintiff has presented evidence that Rogers worked with Copes Vulcan valves on the Forrestal and that Rogers replaced gaskets and packing on these valves on a regular basis. Copes Vulcan admits that many of its gaskets and packing contained asbestos. Therefore, the Court finds that a reasonable jury could find that Rogers was exposed to potentially asbestos-containing Copes Vulcan valves while working on the Forrestal.

The Court also concludes that, under these circumstances, whether that exposure was a substantial factor in causing Rogers' injury is a fact question for the jury. *See Redland Soccer Club,* 55 F.3d at 851.

Copes Vulcan argues that it is also entitled to summary judgment based on the "sophisticated purchaser" defense. Under this defense, Copes Vulcan contends that it was the responsibility of intermediary purchasers of asbestos products such as the Navy to have warned Rogers about the dangers of asbestos. The MDL Court has explicitly ruled, however, that the "sophisticated purchaser" defense "is not available under maritime law in cases involving asbestos." *Mack v. General Electric Co.*, 896 F. Supp. 333, 343 (E.D. Pa. 2012). Therefore, the "sophisticated purchaser" defense is not available to Copes Vulcan.

**Aurora Pump Company**

With regard to Aurora Pump, Chicota testified that Aurora pumps "were all over" the Forrestal, including in Engine Room 1. *Id*. at 31. Chicota could not recall how many Aurora pumps were in Engine Room 1 or where they were located. *Id*. at 334. The only distinguishing feature Chicota could recall was that an Aurora pump had a silver body. *Id*. at 335. Chicota testified that he observed the men in Engine Room 1 replacing the gaskets on the flanges of Aurora pumps as well as the packing around the stem. *Id* at 32. This type of work created dust. *Id. at 33.* He further testified that he saw Rogers work on an Aurora pump in Engine Room 1. *Id*. at 339. Chicota testified that he could not recall how many times he saw Rogers work on an Aurora pump. *Id.* He also testified that he did not know how many times he witnessed Rogers remove or replace gaskets or packing on an Aurora pump as opposed to checking the bearings or lubricating the pumps. *Id*. at 340. Finally, he testified that he did not know whether Rogers removed any original components or parts from an Aurora pump. *Id*. at 341.

Chicota testified that he did not know what entity manufactured the gaskets or packing on any of the Aurora pumps. *Id*. He testified that he did not have any personal knowledge that Aurora required or specified the use of asbestos on its pumps. *Id*. at 344. Although Chicota testified that he ordered replacement gaskets and packing from Aurora, *id*. at 36, he subsequently testified that he could not recall what parts he ordered for an Aurora pump. *Id.* at 345. Although he testified that he saw Rogers install a part that he had directly ordered from Aurora, he could not identify the part. *Id*. at 346-347.

In its answers to interrogatories in another case, Aurora stated that it "manufactured pumps, some of which contained asbestos-containing gaskets and packing, and does not believe that the use of its finished products posed any health hazard." ECF 296, Ex. N at #22. It also stated that the gaskets and packing were purchased primarily from Garlock, Inc. and Crane Packing Company both of which used chrysotile asbestos. *Id.* at #21.

In a separate action, an Aurora representative, Jimmy Leroy Franklin, testified that pump manufacturers such as Aurora used packing made of asbestos because it was the most common packing material used in pumps. ECF 296, Ex. A. pp.78-80, 100. Franklin also testified that Aurora supplied replacement parts for packing gaskets, either directly or through distributors, to the Navy. *Id.* at 95-99, 114-116.

There is testimony that Aurora pumps were present in Engine Room 1 and that Rogers worked on these pumps. Since Rogers was present in Engine Room 1 on a daily basis, a jury could infer that he worked on Aurora pumps on a daily basis. While some of Rogers' work on the Aurora pumps may have been limited to checking the bearings or lubricating the pumps, there is testimony that Rogers also removed and replaced gaskets and packing on the pumps. There is also evidence that Aurora pumps were fitted with asbestos-containing gaskets and packing.Therefore, the Court finds that, viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could find that Rogers was exposed to potentially asbestos-containing Aurora pumps while working in Engine Room 1.

The Court also concludes that, under these circumstances, whether that exposure was a substantial factor in causing Rogers' injury is a fact question for the jury. *See Redland Soccer Club,* 55 F.3d at 851.

In the alternative, Aurora Pump claims it is entitled to summary judgment based on the "bare metal" defense. In *DeVries*, the Supreme Court announced a new "tightly cabined" maritime bare metal test, holding that:

> In the maritime tort context, a product manufacturer has a duty to warn when (i) its product requires incorporation of a part, (ii) the manufacturer knows or has reason to know that the integrated product is likely to be dangerous for its intended uses, and (iii) the manufacturer has no reason to believe that the product's users will realize that danger.

139 S. Ct. at 995.

In *DeVries*, the Supreme Court clarified the "requires" prong of the bare metal test, explaining that "the product [(the turbine)] in effect requires the part [(the asbestos containing insulation)] in order for the integrated product to function as intended" "when: (i) a manufacturer directs that the part be incorporated;" "(ii) a manufacturer itself makes the product with a part that the manufacturer knows will require replacement with a similar part;" "or (iii) a product would be useless without the part." 139 S. Ct. at 995-96.

With regard to the first prong of the bare metal test, whether Aurora directed the incorporation of asbestos-containing parts in its pumps, the Court concludes that there are genuine disputes as to the material fact of whether Aurora sold its pumps with, *inter alia*, asbestos-containing gaskets and packing and knew they would be replaced with similar parts.

15

Regarding the second prong of the bare metal test, whether Aurora had reason to believe its pumps were dangerous, the Court concludes that there is sufficient conflicting evidence about what Aurora had reason to know regarding the dangers of asbestos packing and gaskets that summary judgment is inappropriate. Accordingly, Aurora is not entitled to summary judgment based on the bare metal defense.

### Crane Co.

With regard to Crane Co., Navy inspection reports and work requests confirm that Crane valves were present on the Forrestal and that maintenance on these valves included removing the packing and gaskets. ECF 294-2. Chicota testified that he recalled seeing Rogers "in the vicinity" when work was performed on these Crane valves. *Id.*  However, Chicota also admitted that he did not recall seeing any Crane valves on the Forrestal. *Id.* at 207. Chicota also admitted he never mentioned the presence of Crane valves on the Forrestal during a deposition in another case by a different plaintiff who served on the Forrestal in a nearly identical role as Rogers. *Id*. at 205.

Although there is conflicting evidence as to whether Crane valves were present on the Forrestal, there is no evidence that Crane valves were present in Engine Room 1. While Chicota testified that he observed Rogers working in the vicinity of Crane valves, Chicota contradicted himself by later testifying that he did not recall seeing any Crane valves on the Forrestal and by admitting that he never mentioned the presence of Crane valves on the Forrestal in another asbestos case involving a different plaintiff who served on the Forrestal in a

16

nearly identical role as Rogers. Therefore, there is no evidence from which a reasonable jury could conclude that Rogers was exposed to potentially asbestos-containing Crane valves on a regular basis. Therefore, Crane is entitled to summary judgment.

### **CBS/Westinghouse**

With regard to CBS/Westinghouse, Westinghouse admits that the Forrestal was outfitted with Westinghouse equipment, including the ship's propulsion turbines, some of the ship's service turbine generators, some of the equipment drive turbines and the ship's forced-draft blowers. ECF 278-1 at 1-2. In another case, Westinghouse stated in its answers to interrogatories that certain variations of the following products contained asbestos: condensers, gaskets in equipment, generators, heat transfer products, pumps, reductor gears, steam and gas turbines and ancillary insulation and valves. ECF 299-4.

Chicota testified that the engine and reduction gear on the Forrestal "were Westinghouse." *Id*. at 68-69. According to Chicota, Rogers repaired the valves leading to the main engine and the turbine. *Id*. at 69, 79, 89-90. Although he could not recall the number of times he observed Rogers working on the valves leading to a Westinghouse turbine, Chicota testified that these valves needed to be maintained more frequently than other pieces of equipment. *Id*. at 69-70. Chicota did not identify these valves as Westinghouse valves. He testified that he could not verify whether Rogers on worked on the internal parts of Westinghouse turbines because those in Rogers' position "do not work on turbines." *Id*. at 324. Chicota testified that certain Westinghouse turbines were covered with asbestos

sheeting. *Id.* at 325. He testified that Rogers was "in the vicinity" when the asbestos on the Westinghouse turbine was disturbed. *Id*. at 326.

Chicota also testified that there were Westinghouse forced draft blowers in Engine Room 1. *Id*. at 74. According to Chicota, Rogers maintained the external valves and steam traps on the forced draft blowers. *Id*. at 75-77.

Schwanger testified that he never saw Rogers, while the Forrestal was out at sea, near the insulation of the main propulsion turbines or any of the drive turbines when the insulation was disturbed. ECF 278-3 at 142. Schwanger also testified that Rogers did not work with insulation on any forced draft blowers and Rogers was not near the forced draft blowers when they were being worked on. *Id*. at 135.

Schwanger testified that when the Forrestal was being overhauled at the Norfolk Naval Shipyard, he and Rogers during one shift helped remove the cap insulation from one of the nonoperative main propulsion turbines. *Id*. at 144, 158. Schwanger testified that he observed Rogers remove cap insulation from drive turbines and the main feed pump but he did not know how many times. *Id.* at 74, 160. Nor did he know the name of the manufacturer of the insulation. *Id*. Schwanger guessed that the insulation on the turbine or the pipes around the main feed pumps was not original but was replaced. *Id*. at 74-75.

Neither Chicota nor Schwanger testified that Rogers worked on the internal parts of any Westinghouse turbine or forced draft blower while the Forrestal was out at sea. At best, their testimony revealed that Rogers worked on valves and steam traps that were external to the Westinghouse turbines and

blowers. Neither Chicota nor Schwanger could identify the manufacturer of these valves and steam traps.

However, viewing the evidence in the light most favorable to Plaintiff, the Court finds that a reasonable jury could find, based on Schwanger's testimony, that Rogers was exposed to asbestos-containing insulation on Westinghouse main propulsion and drive turbines while the Forrestal was being overhauled at the Norfolk Naval Shipyard. The Court also concludes that, under these circumstances, whether that exposure was a substantial factor in causing Rogers' injury is a fact question for the jury.

Westinghouse argues that it is nevertheless entitled to summary judgment because Plaintiff has failed to satisfy the Supreme Court's newly formulated bare metal test in *DeVries*. The MDL Court has recently ruled in another maritime asbestos case involving alleged exposure to asbestos-containing insulation in turbines manufactured by Westinghouse for use on the U.S.S. Turner, a Gearing class destroyer, *In re Asbestos Products Liability Litigation*, 547 F.Supp. 3d 491 (E.D. Pa. 2021), that Plaintiffs failed to satisfy the first prong of the tightly cabined bare metal test. Specifically, the Court found that Plaintiff did not satisfy any of the three methods of proof stated by the Supreme Court in *DeVries* for showing that the turbines manufactured by CBS and supplied to the U.S.S. Turner **required** the incorporation of asbestos insulation that made the turbines dangerous. *Id*. at 494-95.

For the same reasons stated by the MDL Court in *In re Asbestos Products Liability Litigation*, *supra*., the Court finds that Plaintiff cannot meet the first prong

of the bare metal test, i.e. that Westinghouse turbines **required** the incorporation

of asbestos insulation.[4]

The Court will add that the evidence in this case reveals that the Navy's

own specifications ("MilSpecs") required that all Naval turbines be delivered "bare

metal" and not accompanied by any type of thermal insulation at the time of

delivery. Affidavit of Rear Admiral John B. Padgett, III [U.S.N., Ret.], ECF 278-4

at ¶ 55. Further, the evidence reveals that the insulation used with

Westinghouse's Navy equipment generally, or with the insulation used with

Westinghouse's Navy equipment on the Forrestal specifically, was furnished by

the Navy's shipbuilder, not by an equipment manufacturer such as

Westinghouse. *Id*.; Faherty Dep. ECF 278-5 at 32, 33, 66-67. There is also no

dispute that suitable non-asbestos insulation was available and had been

approved for use on Navy ships. Padgett Aff., ¶¶ 51-52.

---

[4] Plaintiff argues that the Court should follow a recent decision from the United States District Court for the District of Massachusetts which concluded that in evaluating the first prong of *DeVries* test, the Court does not have to determine whether the turbines required asbestos insulation, but only that they required insulation in general. *See Sebright v. Gen. Elec. Co.,* 525 F.Supp. 3d 217 (D. Mass. 2021) The MDL Court has recently stated that it "disagrees with this conclusion and does not adopt it." *In re Asbestos Products Liability Litigation*, 2021 WL 2828524 at *2 n.1 (E.D. Pa. July 7, 2021). The MDL Court reasoned that "[t]he purpose of the first prong of the bare metal test is for the Plaintiff to show that the 'product requires incorporation of a part' which makes 'the integrated product ... dangerous for its intended uses.'" *Id. citing DeVries*, 139 S. Ct. at 995. The MDL Court further stated that "[I]t is the fact that the part contributes to the overall danger of the product that is the key to this prong, not just that the product requires a certain non-dangerous part." *Id.* This Court certainly agrees with the MDL's Court reasoning.

Plaintiff directs the Court's attention to certain insulation attachment drawings made by Westinghouse which she claims show that it was Westinghouse, not the Navy, that chose the type of insulation to be used with Westinghouse equipment on the Forrestal and that Westinghouse then subcontracted the installation of that insulation to the Navy's shipbuilder. ECF 299, pp. 6-7, 20; ECF 356, pp. 2-3, 5.

However, according to the unrefuted affidavit of Admiral Padgett, these drawings "simply reflects the equipment manufacturer's documentation of **the Navy's choice** of insulation materials **imposed by its MilSpecs** and the mandatory obligation imposed on the Navy's shipbuilder to follow those MilSpecs in the insulation of the supplier's Naval equipment." ECF 278-4, Padgett Aff. at ¶ 55 (emphasis added). In addition, Plaintiff's own naval expert testified that, while Westinghouse would have provided the Navy with certain raw data as to the expected surface temperatures of its equipment, it was the Navy or some other third party, not Westinghouse, that would have then used that information to formulate the insulation plan for that equipment based on the Navy's own insulation MilSpecs.  ECF 278-5, Faherty Dep., pp. 32-35.

Indeed, the MilSpecs confirm Padgett's averments and the Faherty testimony. The MilSpecs reveal that the only insulation-related responsibility of equipment manufacturers was to provide the insulation and lagging attachment devices (hooks, rails, bolts etc.) for the installation of the insulation (ECF 357-1, Mil-T-17600B, § 3.3.2.1(m). The insulation itself was the responsibility of the shipbuilder, not the manufacturer. (*Id*., § 3.3.2.2(n)). More specifically, Mil-T-

17600B, § 3.4.8.1 clarified these two very different roles as to "thermal insulation and lagging" as follows:

> Responsibility. – **The shipbuilder will be responsible for furnishing and installing thermal insulation and lagging on turbines when secured in ship.** The turbine manufacturer shall convey to the shipbuilder information as to the maximum temperatures contemplated in the design during required operation. **The shipbuilder will convey timely information to the turbine manufacturer as to the need for and recommended type of lagging attachments integral with turbine casing and chest.** The **shipbuilder** will forward **his turbine insulation drawing** to the turbine manufacturer for comment.

(*Id.*, Mil-T-17600B, § 3.4.8.1) (emphasis added).  In short, Plaintiff has failed to show that the installation attachment drawings required Westinghouse to use asbestos-containing insulation for its equipment on the Forrestal.

Plaintiff has failed to produce any relevant evidence that Westinghouse directed or specified the incorporation of asbestos containing insulation with the turbines at issue, that Westinghouse made the turbines with asbestos containing insulation attached, and that the turbines would be useless without asbestos containing insulation. *DeVries*, 139 S. Ct. at 995-96.

As a result, summary judgment in favor of CBS/Westinghouse is warranted based on the "bare metal" defense as applied.

### **General Electric**

With regard to General Electric, Chicota testified that there were General Electric generators and steam-driven turbines ("SSTGs") on the Forrestal and that the repairs on the generators were performed by either Rogers or people who worked near him. *Id.* at 79-81, 316. Chicota testified that Rogers was

"present" when General Electric employees removed gaskets and packing from General Electric equipment. *Id*. at 98-99.

Although Chicota testified that Rogers also worked on forced draft blowers and that there were General Electric (in addition to Westinghouse) forced draft blowers on the Forrestal, i*d*. at 75-76*,* he later admitted that he did not know of any other General Electric equipment on the Forrestal other than the SSTGs. *Id*. at 315-316. Plaintiff's expert, Faherty, testified that none of the ship records from the Forrestal show that there was a General Electric forced draft blower on the Forrestal. ECF 287-3 at 184-185. Faherty also testified that there is no testimony, military or personnel records that show Rogers "working in an engine room or any machinery space with a [General Electric] SSTG." *Id*. at 188.

In another case, General Electric's corporate representative, David Skinner, testified General Electric shipped its marine turbines from the factory as "bare metal."  ECF 298-8, at 88. Skinner further testified that the "normal practice" in the 1950s and 1960s was that General Electric would know and expect that its marine turbines would be insulated by the shipyard. *Id*. at 66-67. Skinner also testified that General Electric propulsion turbines manufactured through the 1960s contained "some asbestos gaskets." *Id*. at 93.

There is evidence that SSTGs manufactured by General Electric were on the Forrestal. However, Plaintiff has failed to produce sufficient evidence for a jury to conclude that he was exposed to an potentially **asbestos-containing** SSTG manufactured by General Electric at all, let alone to such an extent that

the exposure was a substantial factor in causing his injury *Lindstrom,* 424 F.3d at 492. Accordingly, General Electric is entitled to summary judgment.

Even if Plaintiff had produced adequate evidence on exposure, General Electric, like, Westinghouse, has asserted the bare metal defense. Again, for the same reasons stated by the MDL Court in *In re Asbestos Products Liability Litigation*, *supra*., the Court finds that Plaintiff cannot meet the first prong of the bare metal test, i.e. that General Electric turbines ***required*** the incorporation of asbestos insulation.

Like with CBS/Westinghouse, the Court will add that the evidence in this case reveals that the Navy's own MilSpecs required that all Naval turbines be delivered "bare metal" and not accompanied by any type of thermal insulation at the time of delivery. Affidavit of Rear Admiral John B. Padgett, III [U.S.N., Ret.], ECF 278-4 at ¶ 55. Further the evidence reveals that the insulation used with General Electric equipment generally, or with the insulation used with General Electric's on the Forrestal specifically, was furnished by the Navy's shipbuilder, not by an equipment manufacturer such as General Electric. *Id*.; Faherty Dep. ECF 278-5 at 66-67; Affidavit of (Paul A. Banaszewski (ECF 287-6) (averring that "Navy turbines manufactured by [General Electric] left the factory and were shipped 'bare metal,' meaning that they had only a coat of paint on the exterior metal surface." *Id*. at ¶ 5. "The Navy required this bare metal shipment because its specifications mandated that its shipbuilders would later furnish and apply any specified heat insulation material after the turbines had been installed aboard ship and tested." *Id.* "There were no [General Electric] specifications for heat

insulation materials to be used with Navy turbines. That subject was exclusively governed by the Navy's Military Specifications." *Id*. at ¶ 8.)

Plaintiff has failed to show that General Electric directed that asbestos-containing insulation be incorporated into its turbines, that General Electric made the turbines with asbestos containing insulation attached, and that the turbines would be useless without asbestos insulation. *DeVries*, 139 S. Ct. at 995-96.

Accordingly, Plaintiff has not met the first prong of the *DeVries* test, i.e. that General Electric turbines **required** the incorporation of asbestos insulation. Accordingly, General Electric is entitled to summary judgment.

## **PUNITIVE DAMAGES/LOSS OF CONSORTIUM**

Finally, Plaintiff's claims for punitive damages and loss of consortium are dismissed. *See The Dutra Group v. Batterton*, 139 S.Ct. 2275, 2278 (2019) (reiterating that in a wrongful death claim under general maritime law, recovery is limited to pecuniary damages); (punitive damages cannot be recovered on claims in admiralty where there is no historical basis for allowing such damages); *Miles v. Apex Marine Corp.*, 498 U.S. 19, 36 (1990). (non-pecuniary damages in survival actions involving wrongful death of seaman, as opposed to non-seafarer, limited to those suffered during the decedent's lifetime because such damages are not permitted under the Jones Act.); *In re Asbestos Products Liability Lit.*, 2014 WL 3353044, at *11 (E.D. Pa. July 9, 2014) (holding that punitive damages may not be obtained in either a wrongful death or survival action under general maritime law);